## In re Stephen A. GRIFFIN.

## No. 2:02–bk–70245M.

United States Bankruptcy Court,
W.D. Arkansas,
Fort Smith Division.

Nov. 21, 2003.

David G. Nixon, Nixon Law Firm, Fayetteville, AR, Diane Sexton, Attorney at Law, Fort Smith, AR, Frederick S. Wetzel, III, Frederick S. Wetzel, P.A., Little Rock, AR, John T. Lee, Attorney at Law, Siloam Springs, AR, Theresa L. Pockrus, The Nixon Law Firm, Fayetteville, AR, for Debtor.

Richard L. Cox, Hot Springs, AR, Richard L. Cox, U.S. Bankruptcy Trustee, Hot Springs, AR, for Trustee.

## ORDER

JAMES G. MIXON, Bankruptcy Judge.

On August 5, 2003, this Court issued its order for Diane Sexton, Attorney–at–Law,

to show cause why she should not be removed from representing Mary McGehee, a secured creditor in this bankruptcy case, because of a conflict of interest. Ms. Sexton was also ordered to show cause why sanctions should not be imposed pursuant to Federal Rule of Bankruptcy Procedure 9011 for filing frivolous pleadings and a fraudulent application for attorney's fees in connection with a claim filed on behalf of Ms. McGehee.

Ms. Sexton filed a response to the Order to Show Cause on August 22, 2003, and appeared at a hearing on the matter on August 27, 2003. At the hearing, Ms. Sexton presented testimony and offered exhibits in response to the Court's Order to Show Cause.

The Court, for the reasons stated in open court pursuant to Federal Rule of Bankruptcy Procedure 7052, ruled from the bench that Ms. Sexton was removed as attorney for Ms. McGehee because of a conflict of interest and the other matters were taken under advisement.

### BACKGROUND

According to the Court's docket in this bankruptcy case, Ms. Sexton first appeared in this case on February 18, 2003, by filing a motion to vacate an order on behalf of Barbara Griffin, who is the wife of the Debtor, Stephen A. Griffin, and the daughter of Ms. McGehee. Since that pleading, Ms. Sexton has also appeared on behalf of the Debtor;[1] Ms. McGehee; Highway 71 South Liquors, Inc.; Charlie Henderson, a creditor; and Ella Cooper, Douglas Payne, and Anna Corpening, administrative expense creditors.

### FRIVOLOUS PLEADINGS

On behalf of Barbara Griffin, Ms. Sexton propounded Requests for Admission to the Trustee pursuant to Federal Rule of Bankruptcy Procedure 7036. The Request was filed May 14, 2003. The Trustee filed his answer to the Request on June 16, 2003, and on June 17, 2003, Ms. Sexton filed a motion styled "Barbara Griffin's Impeachment of Richard Cox's Response to First Requests For Admission Propounded to Richard Cox, Trustee, Motion to Strike, and Request for Sanctions under FRCP 11". The substance of the pleading is as follows:

COMES NOW, Barbara Griffin, by and through her attorney Diane Sexton of The Sexton Law Firm, and for her impeachment of Richard Cox's responses to her First Request for Admissions, Motion to Strike, and Request for Sanctions under F.R.C.P. 11 states:

*REQUEST FOR ADMISSION NO. 1:* Please admit that on or about May 9, 2003 you tendered a profit and loss statement regarding Highway 71 South Liquors, Inc. for the months of February, March, and April, 2003.

RESPONSE: Denied. I have not operated a corporation.

**IMPEACHMENT:** The statement "I have not operated a corporation" is nonresponsive. However, by Document No. 606 filed on June 11, 2003, which is substantially a duplicate of the one tendered to Ms. Griffin on or about May 9, 2003 after a letter to Judge Mixon requesting same, Richard Cox filed in this case for Highway 71 South Liquors, Inc., Mr. Cox submitted the February, 2003 "Profit and Loss" statement. The figures are identical.

By Document No. 607 filed on June 11, 2003, which is substantially a duplicate of the one tendered to Ms. Griffin on or about May 9, 2003, Richard Cox filed in this case for Highway 71 South

---

1. Ms. Sexton was removed as attorney for the Debtor by an order entered May 6, 2003.

Liquors, Inc., Mr. Cox submitted the March, 2003 "Profit and Loss" statement. The figures are identical.

By Document No. 608 filed on June 11, 2003, which is substantially a duplicate of the one tendered to Ms. Griffin on or about May 9, 2003, Richard Cox filed in this case for Highway 71 South Liquors, Inc., Mr. Cox submitted the April, 2003 "Profit and Loss" statement. The figures are identical.

By Document No. 609 filed on June 11, 2003, Richard Cox filed in this case for Highway 71 South Liquors, Inc., Mr. Cox submitted the May, 2003 "Profit and Loss" statement.

*REQUEST FOR ADMISSION NO. 2:*
Please admit that you had no part in the management of Highway 71 South Liquors, Inc. prior to February 20, 2003 when you took Barbara Griffin's keys.

RESPONSE: Admitted. I have had no part in the management of a corporation.

*REQUEST FOR ADMISSION NO. 3:*
Please admit that by your own figures provided in your Profit and Loss statement that the gross profit of Highway 71 South Liquors, Inc. was $54,156.08 for February, 2003 when Barbara Griffin had been managing the business.

*RESPONSE:* Denied.

**IMPEACHMENT:** By Document No. 606 filed on June 11, 2003, Richard Cox filed in this case for Highway 71 South Liquors, Inc., Mr. Cox submitted the February, 2003 "Profit and Loss" statement. The Gross Profit for Highway 71 South Liquors, Inc. is shown as $54,156.08. Mr. Cox did not confiscate Barbara Griffin's keys until on or after February 20, 2003. Mr. Cox demanded these keys in contravention of Arkansas law which gives Mrs. Griffin either the entirety of the land, improvements and business or her dower one-half interest free and clear of any indebtedness.

*REQUEST FOR ADMISSION NO. 4:*
Please admit that by your own figures provided in your Profit and Loss statement the gross profit of Highway 71 South Liquors, Inc. was only $21,232.48 for March, 2003, the first month of your management of the business.

RESPONSE: Denied.

**IMPEACHMENT:** By Document No. 607 filed on June 11, 2003, Richard Cox filed in this case for Highway 71 South Liquors, Inc., Mr. Cox submitted the March, 2003 "Profit and Loss" statement. The Gross Profit for Highway 71 South Liquors, Inc. is shown as $21,232.48.

*REQUEST FOR ADMISSION NO. 5:*
Please admit this is a decrease of 39.2 per cent in the gross profits.

RESPONSE: Denied.

**IMPEACHMENT:** $21,232.48 divided by $54,156.08 is 39.2 per cent. A simple matter of mathematics.

*REQUEST FOR ADMISSION NO. 6:*
Please admit that under your management Highway 71 South Liquors, Inc. has never met the level of gross profit as under the management of Barbara Griffin.

RESPONSE: Denied.

**IMPEACHMENT:** By Document 608 filed on June 11, 2003, Richard Cox filed in this case for Highway 71 South Liquors, Inc., Mr. Cox submitted the April, 2003 "Profit and Loss" statement[.] The Gross Profit for Highway 71 South Liquors, Inc. is shown as $31,840.14, which is obviously less than the $54,156.08 which Barbara Griffin made.

By Document No. 609 filed on June 11, 2003, Richard Cox filed in this case for Highway 71 South Liquors, Inc., Mr.

Cox submitted the May, 2003 "Profit and Loss" statement. The Gross Profit for Highway 71 South Liquors, Inc. is shown as $27,523.74, which is obviously less than the $54,156.08 which Barbara Griffin made.

Based upon the above documentation, all of which has been filed for record by Richard Cox, Mr. Cox in his Responses to the Requests for Admissions was not truthful.

WHEREFORE, premises considered, Barbara Griffin moves to strike the Responses filed by Richard Cox as being untruthful, as being in violation of F.R.C.P. 11(b)(1), (2) and (4), for her costs and fees incurred herein, and for all other relief which is proper.

Motion for Impeachment of Trustee, June 17, 2003.

At the time the Request for Admissions was filed on May 14, 2003, the only matter pending between the Trustee and Barbara Griffin was Adversary Proceeding 03–07039 filed by the Trustee to recover property allegedly transferred to Ms. Griffin in violation of 11 U.S.C. §§ 544, 548, 549, and 550. The Request for Admissions has virtually no connection to the issues in the pending adversary proceeding.

Request for Admission Number One propounded by Ms. Sexton was premised on the Trustee admitting that the business he was operating was Highway 71 South Liquors, Inc. This Court had previously determined by order entered April 11, 2003, that neither the real estate nor the liquor store business was ever transferred from the Debtor to the corporation, Highway 71 South Liquors, Inc., and no appeal was taken from that order. Therefore, the business was not an asset of Highway 71 South Liquors, Inc. but belonged instead

to Stephen Griffin and upon the bankruptcy filing became property of the estate to be administered by the Trustee when the case was converted from Chapter 11 to 7. Request Number Three and, by implication, Request Numbers Four, Five, and Six were premised on the Trustee admitting that Highway 71 South Liquors, Inc., was a business operated by Barbara Griffin. Both issues are contested by the Trustee.

■ If Ms. Sexton questioned the sufficiency of the Trustee's answer or wished to object to the answer then she should have filed a motion to determine the sufficiency of the answer pursuant to Federal Rule of Bankruptcy Procedure 7036(a). The motion to cite the Trustee for violation of Federal Rule of Bankruptcy Procedure 9011 because his answer to the Request for Admissions did not admit facts genuinely in dispute was frivolous and is itself a violation of Rule 9011. 10 Collier on Bankruptcy ¶ 9011[4] (Alan N. Resnick & Henry J. Sommer, et al. eds., 15th ed. rev.1993) (commenting that the filing of a motion for sanctions "is itself subject to the requirements of the rule and can lead to sanctions") (quoting Fed. R. Bankr.P. 9011 advisory committee note 1997 (quoting Fed.R.Civ.P. 11 advisory committee note 1993)).

## APPRAISER'S FEE APPLICATION

On June 12, 2003, the Trustee filed an application to pay Wilson Auctioneers, Inc., $350.00 [2] for services rendered in the performance of an appraisal of the Debtor's personal property located at the Debtor's residence in Ft. Smith and at a lake house at Mt. Ida in Montgomery County, Arkansas. On June 13, 2000, Ms. Sexton, on behalf of Barbara Griffin, filed an objection to payment of the appraiser's fee and

---

**2.** Because of a scrivener's error, the amount of the fee was erroneously submitted to the

Court as $350.00 when it should have been $750.00.

a hearing was conducted at Hot Springs, Arkansas, on July 30, 2003.

 Ms. Sexton's argument at the hearing was that "it is of [no] value to the estate. It has generated no income for the estate. No creditors have been paid. The only person to realize any benefit from this is the auctioneer himself." (Tr. at 6, Objection to Compensation for Appraiser, July 30, 2003.) Ms. Sexton offered no evidence that the appraisal fee was not an appropriate amount or that the service was not performed. Trustees routinely seek the opinion of appraisers so they can make better informed decisions about how to liquidate property. The objection was completely frivolous and was a waste of time for the Court and the parties.

## FRAUDULENT FEE APPLICATION AND CONFLICT OF INTEREST

The issue of whether to sanction Ms. Sexton under Rule 9011 for attorney's fees charged to Ms. McGehee must be considered in light of her conflict of interest in representing Ms. McGehee. The Court has previously removed Ms. Sexton as attorney for Ms. McGehee because of a conflict of interest as detailed in open court at the hearing on August 27, 2003.

Background information about the procedural posture of this case as it relates to Ms. McGehee's position as a creditor is necessary to a determination of whether Ms. Sexton's fee application is sanctionable pursuant to Rule 9011. Prior to the Debtor's bankruptcy filing, he had executed a note secured by a deed of trust in real property located in Montgomery County, Arkansas, referred to by the parties as "the lake house." The Debtor filed for Chapter 11 on January 14, 2002, at which time Bancorp South or its predecessor in interest held the deed of trust.

On November 19, 2002, while the Chapter 11 was still pending, the Debtor and Bancorp South entered an agreed order relaxing the automatic stay as to the lake house if the Debtor could not secure a bona fide offer to purchase by December 5, 2002. An order relaxing the stay as to the lake house was subsequently entered December 11, 2003. For reasons not shown on the record, the parties did not include in the order a paragraph abandoning the property from the estate. Bankcorp South filed a foreclosure action in state court on December 16, 2002.

Ms. McGehee, an 83–year–old widow, purchased the note secured by the lake house for $304,260.09 and by virtue of the purchase became a creditor in the case. The purchase occurred January 11, 2003. Ms. McGehee was substituted as plaintiff in the foreclosure action.

The case was converted to a case under Chapter 7 on February 5, 2003, and a trustee was appointed to administer the estate. Because the property was not abandoned from the estate, the Trustee became a party in interest in the pending state foreclosure action on the lake house. The Trustee removed the foreclosure action to the Bankruptcy Court in an application for removal filed March 4, 2003, in adversary proceeding 03–07043. Thereafter, Ms. Sexton, on behalf of Ms. McGehee, filed a motion to abandon and for relief from the stay to continue the foreclosure action. After a hearing in Fayetteville, Arkansas, on June 3, 2003, the Court denied the motion for relief and ordered the Trustee to liquidate the lake house within ninety (90) days. Ms. Sexton, on behalf of Ms. McGehee, has opposed the Trustee's efforts to liquidate the lake house. *See, e.g.,* Objection to Trustee's Motion for Sale of Real Property as Being Violative of U.S. Supreme Court Case of Dewsnup, filed by Mary McGehee, July 10, 2003.

## SHOW CAUSE HEARING

At the show cause hearing on August 27, 2003, Ms. Sexton offered her own sworn testimony, and the testimony of Barbara Griffin and Ms. McGehee.

Ms. McGehee testified that Ms. Sexton did not consult with her until after she purchased the note and mortgage. She stated that she discussed the issue of conflict of interest with Ms. Sexton on more than one occasion, and that she did not perceive any conflict. (Tr. at 19, August 27, 2003 hearing.) Ms. Sexton entered her appearance on behalf of Ms. McGehee in the foreclosure action, and Ms. McGehee wanted it to proceed. Ms. McGehee said she was satisfied with all of the legal fees Ms. Sexton had charged her and said she did not think she had been charged for time that should have been billed to Mrs. Griffin. (Tr. at 22, August 27, 2003 hearing.) She said she wanted to enjoy the lake house and keep it in the family. She testified that while the case has been pending, Mrs. Griffin has been occupying the house and that Mrs. Griffin had been paying her the accruing interest on rent, but that Ms. McGehee is not now receiving interest payments by agreement.

On examination by the Court, Ms. McGehee testified that Ms. Sexton was not her attorney before she purchased the note. She seemed confused when confronted with Ms. Sexton's legal bills, which charged her $1,650.00 for services in connection with the purchase of the lake house note. When the Court asked her if she remembered a meeting prior to purchasing the note for which Ms. Sexton charged her $375.00, Ms. McGehee replied that she mostly consulted with her daughter, Mrs. Griffin. Ms. McGehee finally stated she must have had a lapse of memory. (Tr. at 26, August 27, 2003.)

Ms. McGehee further testified that she received assurances in regard to the note purchase from friends, Mrs. Griffin, and Ms. Sexton. She later acknowledged that Ms. Sexton advised her concerning the note, but she made up her own mind. Ms. McGehee testified that she did not recall a discussion with Ms. Sexton regarding the interest rate of the note.

When questioned by the Court, Ms. McGehee stated the following about Ms. Sexton's court appearance in Fort Smith, Arkansas, on March 27, 2003, and in Little Rock on May 16, 2003:

Q. And you remember the day your brother passed away and you had to go to his funeral?

A. Yes.

Q. Are you telling me you think it's correct that she should charge you $1,350.00 for being in court that day, even though it didn't have anything to do with your case?

A. Well, it must have had some relevance or she wouldn't be charging me for it.

Q. So you're relying on her statement to you that it benefitted you?

A. Yes.

Q. Do you know what matters were considered at that hearing?

A. Well, since I was not there I don't know.

Q. And the same question about the hearing in Little Rock; do you know what that was about?

A. Vaguely. I wasn't there. Since I wasn't there, I don't know other than what I heard from Barbara telling me some.

Q. But you were told that this involved your issues; right?

A. Yes.

Q. Do you think that's fair that she should charge you $1,200.00 to go down to Court and sit there and not even

participate in a case that doesn't involve you at all?

A. There must have been some aspect of it that did.

Q. Or she wouldn't have charged you?

A. That's right.

Q. So you have complete faith in Ms. Sexton?

A. I really do, yes.

(Tr. 28–29, August 27, 2003 hearing.)

Ms. McGehee was not aware that Ms. Sexton represented the Debtor at one point in time or that she represented several other creditors and parties in interest in the case.[3] Ms. McGehee stated that she has paid Ms. Sexton "something like $50,000.00" as of the August 27, 2003, hearing date. (Tr. at 33, August 27, 2003 hearing.) She also stated she was not aware that when Ms. Sexton entered her appearance on behalf of Ms. McGehee as plaintiff in the foreclosure that her daughter was a defendant who was also represented by Ms. Sexton and for a time her son-in-law, the Debtor, was also represented by Ms. Sexton.

Mrs. Griffin was also called as a witness by Ms. Sexton. She agreed that Ms. Sexton met with her and her mother to discuss conflict of interest and that her mother was charged $1,425.00 for the meetings even though Mrs. Griffin was not charged. (Tr. at 57, August 27, 2003 hearing.) Mrs. Griffin acknowledged that her mother was also charged for discussing with Ms. Sexton whether Mrs. Griffin should pay her mother the accruing interest on the $304,000.00 debt. She said this issue was discussed for two hours and that her mother paid for the entire two hours because it was for "my mom's benefit." (Tr. at 59, August 27, 2003 hearing). Mrs. Griffin testified that she thought Ms. Sexton's bills were fair and that Ms. McGehee was not charged for services rendered only for Mrs. Griffin's benefit. (Tr. at 46, August 27, 2003 hearing.) She said she has ceased making interest payments on the note to her mother because her mother requested it because Ms. McGehee stated, "I know you're strapped ...." (Tr. at 53, August 27, 2003 hearing.)

Mrs. Griffin characterized her mother as a wealthy person who could afford not to receive the accruing interest on the $304,000.00 debt. Mrs. Griffin said she had paid Ms. Sexton close to $10,000.00.[4] Mrs. Griffin works in Ms. Sexton's office as a paralegal, but she is not paid for her services.

When questioned whether it was reasonable for Ms. Sexton to charge Ms. McGehee $150.00 per hour for 34 hours for looking at the lake house, Mrs. Griffin stated:

A. Well, and my mom is the one that keeps asking her to do this stuff. If that's what my mom wants to do, that's my mom. My mom is 82 years old. She's taken care of herself this long; and whenever I try to suggest anything, she tells me, "Barbara, I am fully capable of making my own decisions."

Q. You don't feel that you and Ms. Sexton are taking advantage of her?

A. I don't think my mom is a person who can be taken advantage of.

(Tr. at 60–61, August 27, 2003 hearing.)

Furthermore, Mrs. Griffin admitted that Ms. Sexton charged Ms. McGehee for the

---

3. The state foreclosure action was removed to the Bankruptcy Court on March 4, 2003, and was assigned AP No. 03–07043. The style of the action is "Mary F. McGehee vs. Stephen A. Griffin, Barbara Griffin ... and Richard L. Cox, Trustee". Ms. Sexton, therefore, represents the plaintiff and one of the defendants in this adversary proceeding.

4. Ms. Sexton testified that Ms. Griffin has paid $5,000.00. See page 18 *infra*.

entire six hours the 341(a) meeting lasted, but did not charge Mrs. Griffin anything.

Mrs. Griffin was also questioned about the charges related to the March 27, 2003, hearing at Ft. Smith:

Q. And the hearing that we had on March the 27th, none of that concerned your mother's issue; did it?

A. Again, my mom is the one that keeps—when she hears that there's a meeting, she asks Diane to go for her because she doesn't want to drive to these places. She's been upset that she's had to come to Hot Springs.

Q. Do you think that's fair?

A. It's my mom's decision.

Q. You don't think your mother is being taken advantage of when she's billed $1,350 for a lawyer to appear at a hearing in which your issues were litigated and not hers?

A. If my mom has no problem with it, that's her decision. I mean, I was taught to respect my mom and to respect—my dad was an Air Force man and they lived an Air Force life. He was gone all the time. He flew B–52's, and my mom was left raising the four children; and she was very capable of making her decisions. She's always been an astute businesswoman. She's always done investments in stock and everything. She learned from the best of them, and I have every confidence in her decisions. She's gotten me out of a lot of hot water in my life.

(Tr. at 61, 62, August 27, 2003 hearing.)

The Court questioned Mrs. Griffin about whether it was in Ms. McGehee's best interest not to receive interest on the note:

Q. Do you consider that to be in her best interest if you quit paying the interest?

A. I am grateful that she said I could quit paying the interest.

Q. That wasn't my question. Do you think that's in her best interest?

A. Well, when the Trustee—if he sells the property, whoever buys the property will pay the interest. So yeah, that's in her best interest.

Q. It's in her best interest that you quit paying it?

A. Yes, because BankcorpSouth refused to let us pay the interest; and then when she bought the note, she had to pay all the accrued interest. So the same thing will happen this time. That's what she said. She said, "Why should you keep paying the interest when I had to pay the interest when I bought the property." That was her decision.

(Tr. at 62–63, August 27, 2003 hearing.)

The Trustee asked Mrs. Griffin the following:

Q. Well, at the hearing on her Motion for Abandonment held in Fayetteville, the Judge specifically informed everybody present that I wouldn't be allowed to sell the property unless Ms. McGehee's claim as allowed would be paid in full. Do you recall that?

A. Yes, I recall that.

Q. So why would there be a purpose in Ms. McGehee filing an objection to my motion to sell, which was heard here, if I would not be able to sell the property unless she was going to be paid?

A. Because I don't have any trust in what's decided here. We were also told we would get an appraisal at the last hearing, and we still don't have an appraisal. We were told that Benefit Bank would get the full amount of their lien, and they ended up having to pay $22,000 and bid on their own property. I consulted with Teresa Pockrus at the Nixon Law Firm and said, "Are you sure my mom will get her money?" And

she said, "We don't know." Nobody knows. We don't have any confidence in this system. I'm sorry.

Q. So you're saying that you and Ms. Pockrus didn't accept the Court's statement that the property would not be sold by me unless your mother's claim was paid?

A. I really have no faith in what you do right now, no, sir.

Q. All right. But the purpose here, just like your mother—you've heard her testimony in Court today, and she said her purpose here is to retain—she wants title to the lake house for the use of her and her family.

A. She has come to that decision when she has seen that she doesn't know if the note will continue. So she would rather be able to do the foreclosure than sell it to somebody else. She bought the note thinking that she could either keep the note as an investment or get the lake house. Those were her two possibilities when purchasing the note.

(Tr. at 66–67, August 27, 2003 hearing.)

Mrs. Griffin is listed on Ms. Sexton's letterhead as a paralegal, but Mrs. Griffin states her function is that of a business manager, and she is not compensated for her work for Ms. Sexton. Mrs. Griffin has borrowed $20,000.00 from Ms. McGehee during this bankruptcy case, and the proceeds of the loan were used to pay the Debtor's attorney's fees to his current attorney, Mr. Nixon. Mrs. Griffin was unsure whether Ms. McGehee has spent $50,000.00 in attorney's fees or some amount less than that; she stated her mother is confused on the amount in legal fees her mother has incurred. (Tr. at 80, August 27, 2003.)

Ms. Sexton testified on her own behalf. She stated that in December, Mrs. Griffin approached her about representing her mother and Ms. Sexton declined, stating, "I don't think that would be right." (Tr. at 101, August 27, 2003 hearing.). However, after consulting an attorney whom she respected, she decided it was permissible to represent both clients. She testified that Mrs. McGehee has paid $17,021.00 and Ms. Griffin has paid $5000.00 [5] in legal fees and that this case is consuming most of her time. (Tr. at 108, August 27, 2003.)

She stated the reason she filed the Rule 11 motion against the Trustee was because the Trustee had alleged that Mrs. Griffin had not made a meaningful contribution sufficient to earn compensation from Highway 71 South Liquors, Inc. Ms. Sexton expressed the notion that filing the Rule 11 motion "did not impugn Mr. Cox [the Trustee] as an attorney because I just don't think lawyers should impugn each other." (Tr. at 107, August 27, 2003 hearing.)

Upon questioning by the Court, Ms. Sexton first denied and then admitted that she represented Ms. McGehee in connection with the purchase of the note:

Q. Okay. That's all I asked. Did you represent Ms. McGehee in connection with the purchase of the note and the assignment of the mortgage?

A. No. Sir. I advised her not to do it, and she went ahead and they did it. I did meet with her. I did say, "Don't sell your Wal–Mart stock; don't do this." I also said, "Please go and meet with other people." We did this over a period of time. I explained to her then why I wouldn't recommend it, but I also understand that my opinion compared to that of Dane Clay or Gary Richardson is nothing.

Q. My question is, did you or did you not represent her in connection with the

5. Mrs. Griffin testified she has paid $10,000.00.

purchase, give her advice concerning the purchase of the note?

A. I advised her not to do it.

Q. Did you represent her then?

A. I did not represent her when she met with Michael Redd to purchase it.

Q. Well, you've charged her 11 hours at $150.00 an hour for $1,650 from December 30th to January 13th for meeting with her in connection with the purchase of the lake house from Bancorp, the feasibility of selling Wal–Mart stock, and finalizing the terms of proposed purchase of Bancorp.

A. Yes sir.

Q. I don't understand how these time charges can be correct if you're telling me here under oath that you didn't represent her in connection with the purchase of the note.

A. I advised against selling the Wal–Mart stock, and I advised against the purchase. When that advice is overruled, I said, "Here's the interest you're making on your Wal–Mart stock. This is the value of Wal–Mart. They've been around a long time. This is the interest you can make on this note. This is how long it will take for you to realize your money on this note. These are decisions that you can make. I can give you my opinion."

I did not meet with Michael Redd. I met with Ms. McGehee and Ms. Griffin.

Q. So you were representing her, and you charged her for those services, didn't you?

A. If you want to put it that way, Sir. What I view is if you go to the closing, you're representing them. I didn't go to the closing.

Q. Well, you were advising her, at least?

A. Yes, Sir, for whatever my advice was worth.

Q. And you charged her for that legal advice?

A. Yes, Sir, after she said, "Are you going to send me a bill?"

Q. Okay.

A. At that point in time, I said, "Well, okay."

Q. I mean, I just get confused because you say you didn't represent her, and she said you didn't represent her. In your opening statement, you said you didn't represent her; but you charged her $1,650, which you say was for advice concerning the purchase of the note.

A. Yes, Sir. As I'm trying to explain, I advised against it. I grew up with the Mosley family, and they have one of the largest abstract companies in Northern Arkansas. If you're representing someone in a real estate deal, as Bill would have said, you go to the closing. If you don't go to the closing, you didn't represent either the buyer or the seller. I did not go to the closing.

(Tr. at 108–111, August 27, 2003 hearing.)

Ms. Sexton denied charging only Ms. McGehee for discussing conflicts of interest and stated she charged Mrs. Griffin as well, but she did not know how much.[6] She said it would total at least 18 hours.

When asked whether it was fair to charge Ms. McGehee for the nine-hour hearing in Fort Smith involving matters unrelated to Ms. McGehee's issues, Ms. Sexton stated:

A. My 82–year–old client said, "I'm the one who asked you to be there all day long and tell me what happened. You could have left at any time." She said she felt she was the one who should pay that.

---

6. Mrs. Griffin testified that she was not billed for these conflict-of-interest conferences.

Q. My question is do you think that's fair? An 82–year–old lady who trusts you, and you did all this for all these other people and billed her for this work; do you think that's fair?

A. I don't think any legal bill is fair.

Q. Do you think it's fair to give that lady the bill for the work you did for her daughter that I just outlined?

A. I think it's fair to defer to what she said.

Q. What Ms. McGehee said?

A. Yes, Sir, I do. As I said, I don't think any legal bill is fair. God knows I've written off far more bills than I've ever collected. Little Rock is full of people who got free legal service.

(Tr. at 115, August 27, 2003 hearing.)

Ms. McGehee's interest would have been best served if she had not purchased the note. If she wanted to buy the lake house for her son-in-law and daughter, all she had to do was bid it in at the foreclosure sale or at the Trustee's sale. Becoming a creditor in the case has proved to be a financial disaster for Ms. McGehee. Ms. Sexton does not understand some basic principles of bankruptcy law such as the difference between an order of abandonment and an order granting relief from the stay. This lack of knowledge impeded Ms. Sexton's ability to represent any of her clients' interests.[7] Mrs. Griffin's interest is served if she can prevent the sale of the lake house to a third party while Ms. McGehee's interest is served by getting her secured claim paid in full. Ms. Sexton is sacrificing Ms. McGehee's interest to promote the interest of Mrs. Griffin and in the process she is shamelessly and unfairly loading Ms. McGehee with most of the legal expense.[8]

7. For example, when Ms. Sexton was asked by the Trustee about the effect of a relief from stay, Ms. Sexton replied:

A. Well, according to the Appellate Court cases I have found, it means that that is outside the bankruptcy. To bring it back in, you have to show that when that ruling was made, there was no finding that it had little or no value to the estate and there was no finding that the amount owed was less than the value of the property.

I believe there was one other thing, but my mind is kinda scrambled after taking high blood pressure drugs. I enumerated every one of those, and I'll be happy to look them up for you. They're cited in *In re Abdulhassen* and in *In re Hood.* I can name .several other cases. I can provide you with those cases.

I have taken the time and trouble to ask other attorneys who are quite knowledgeable in the appellate process who agree with that interpretation.

Q. So your opinion in representing Ms. McGehee in this bankruptcy proceeding is that an order granting relief from stay removes the collateral that's the subject of that motion from being an asset of the bankruptcy estate and removes it from the jurisdiction of the Bankruptcy Court?

A. Sir, that's not my opinion. That's the opinion of the Ninth Circuit, the Fifth Circuit, the Sixth Circuit and, I believe, the Second Circuit.

. . .

Q. Ms. Sexton, my question, though, is—

A. I answered your question.

Q. Well, let me ask it again because I don't think you did. You've billed her $17,000, and it's all based upon you thinking that I should not be able to sell the lake house because you believe it's not an asset of the Chapter 7 estate?

A. And I answered that. I said no, it is not my thinking; it is the cases that are in the Ninth Circuit, the Sixth Circuit, the Second, the Third and others I could name.

(Tr. at 119–120, August 27, 2003.)

8. Many of the charges are overstated in terms of time spent on the task compared with the time that should reasonably have been incurred. For example, Ms. Sexton billed 1.5 hours to prepare a four-sentence motion for continuance; 2 hours to discuss the interest rate of a fixed rate note; and 26 hours to view the lake house. For a more detailed discussion of legal fees charged to Ms. McGehee, see *In re Griffin,* 302 B.R. 1, 2003 WL 22861597 (Bankr.W.D.Ark.2003).

## SANCTIONS

Federal Rule of Bankruptcy Procedure 9011 closely follows the language of Rule 11 of the Federal Rules of Civil Procedure. The bankruptcy rule provides in parts relevant to the facts of this case that:

> By presenting to the Court ... a petition, pleading, written motion, or other paper, an attorney is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances—
>
> (1) it is not being presented for any improper purpose ...
>
> (2) the claims ... therein are warranted by existing law or by a nonfrivolous argument ...
>
> (3) the allegations ... have evidentiary support ...

Fed. R. Bankr.P. 9011(b)(1)-(3).

The Bankruptcy Court is empowered to impose sanctions on an attorney for violation of Rule 9011. Prior to imposing sanctions, the Court is required by the rule to follow certain procedures:

> (c) *Sanctions.* If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.
>
> (1) *How Initiated.*
>
> · · ·
>
> (B) *On court's Initiative.* On its own initiative, the court may enter an order describing the specific conduct that appears to violate subdivision (b) and directing an attorney, law firm, or party to show cause why it has not violated subdivision (b) with respect thereto.

> (2) *Nature of Sanction; Limitations.* A sanction imposed for violation of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated. Subject to the limitations in subparagraphs (A) and (B), the sanction may consist of, or include, directives of a nonmonetary nature, an order to pay a penalty into court, or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation.
>
> · · ·
>
> (3) *Order.* When imposing sanctions, the court shall describe the conduct determined to constitute a violation of this rule and explain the basis for the sanction imposed.

Fed. R. Bankr.P. 9011(c)(1)-(3).

*See, e.g., Grunewaldt v. Mutual Life Ins. Co. (In re Coones Ranch, Inc.),* 7 F.3d 740, 744 (8th Cir.1993) (affirming bankruptcy court ruling imposing sanction of attorney filing papers that were legally unreasonable, without factual foundation, and without a proper purpose); *Brown v. Mitchell (In re Ark. Communities, Inc.),* 827 F.2d 1219, 1221–22 (8th Cir.1987) (upholding district court's affirmance of bankruptcy court's sanctions of attorney pursuant to Bankruptcy Rule 9011).

 Bankruptcy Rule 9011 closely tracks Federal Rule of Civil Procedure 11, which imposes "an affirmative duty to conduct a reasonable inquiry into the facts and the law." *Business Guides, Inc. v. Chromatic Communications Enters., Inc.,* 498 U.S. 533, 551, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991). The legal standard for alleged violations of Rule 11 is "reasonableness under the circumstances." *Business Guides,* 498 U.S. at 551, 111 S.Ct. 922. Bankruptcy Rule 9011 requires a pleading

to have evidentiary support or be likely to have evidentiary support after reasonable inquiry. *Halverson v. Funaro (In re Frank Funaro, Inc.)*, 263 B.R. 892, 903–04 (8th Cir. BAP 2001).

The evidence before the Court is that Ms. Sexton has violated Bankruptcy Rule 9011 by filing frivolous pleadings including a Motion for Rule 11 sanctions against the Trustee and an objection to an appraiser's fee of $350.00. Nothing about the facts or the law governing the issues in this case provided any evidentiary basis to file either pleading.

In addition, the application for attorney's fees was filed for an improper purpose. The application is fraudulent in that Ms. Sexton has represented that she was performing services for Ms. McGehee's benefit when in fact she was representing her own interest and the interest of Mrs. Griffin. Moreover, charges for services performed on behalf of Ms. McGehee were often excessive or the services performed were unnecessary. Ms. Sexton is guilty of overreaching a vulnerable and elderly client and has violated multiple sections of the Model Rules of Professional Conduct.[9]

As sanctions for violating Rule 9011 and for charging Ms. McGehee for services performed for another client, Ms. Sexton is hereby assessed a fine of $950.00 payable to the Clerk of the U.S. Bankruptcy Court for the Eastern and Western Districts of Arkansas. A copy of this opinion will be forwarded to the Arkansas Committee on Professional Conduct as a judicial complaint against Ms. Sexton.

IT IS SO ORDERED.

---

9. For examples of Ms. Sexton's violations of the Model Rules of Professional Conduct, see Rule 1.1. Competence; Rule 1.5. Fees; Rule 1.7. Conflict of interest: general rule; Rule 3.1. Meritorious claims and contentions; and Rule 8.4. Misconduct.